UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

PRATHIK PATEL, Individually and on Behalf
of All Others Similarly Situated,

                   Plaintiff,

    vs.

LULULEMON ATHLETICA INC., CALVIN
MCDONALD, and MEGHAN FRANK,

                   Defendants.

———————————————————— x

Civil Action No. 1:24-cv-06033-ALC

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ...................................................................................................1

JURISDICTION AND VENUE .............................................................................................6

PARTIES ................................................................................................................................6

SUBSTANTIVE ALLEGATIONS ......................................................................................10

    Lululemon and Its Business ......................................................................................10

    U.S. Women's Products Was Lululemon's Key Market Before and During the
        Class Period .................................................................................................11

    Effective Inventory Management Was Crucial for Lululemon to Generate
        Revenue and Profit From U.S. Women's Products During the Class Period.......13

    Analysts and Investors Were Highly Attuned to the Composition and Quantity of
        Lululemon's Inventory by the Start of the Class Period........................................15

    By January 2023, Defendants Intentionally Shifted Lululemon's Inventory
        System to a Cloud-Based Program That Gave Defendants Accurate Real-
        Time Inventory Visibility ......................................................................................18

    Lululemon Implemented a Back-to-School Marketing Campaign Directed
        Towards Younger U.S. Women Beginning in July 2023 ......................................23

    Lululemon Did Not Purchase Enough Sizes 0 to 4 and Colors of U.S. Women's
        Products in FY23 to Capture the Increased Demand From the 2023
        Marketing Campaign .............................................................................................27

    Defendants Knew, or Recklessly Disregarded, During the Class Period That
        Lululemon Lacked Sufficient Sizing and Color to Meet the Demand for
        U.S. Women's Products Created by the Company's 2023 Marketing
        Efforts to Younger U.S. Women............................................................................31

    Defendants Knew, or Recklessly Disregarded, That the Breezethrough Legging
        Would Not Materially Improve Lululemon's Revenue or Profit in FY24 ...........37

MATERIALLY FALSE AND MISLEADING STATEMENTS  AND OMISSIONS
DURING THE CLASS PERIOD ...................................................................................42

    The Materially False And Misleading Inventory Allocation Misstatements And
        Omissions...............................................................................................................43

**Page**

The Materially False and Misleading Breezethrough Legging Misstatements and Omissions ...................................................................................................................48

ADDITIONAL SCIENTER ALLEGATIONS ............................................................................50

LOSS CAUSATION/ECONOMIC LOSS ..................................................................................58

CLASS ACTION ALLEGATIONS ............................................................................................63

NO SAFE HARBOR ....................................................................................................................65

APPLICATION OF PRESUMPTION OF RELIANCE:  THE *BASIC* and *AFFILIATED UTE* PRESUMPTIONS .......................................................................................................66

    COUNT I .................................................................................................................................68

    For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ..................................................................................................................68

    COUNT II ...............................................................................................................................69

    For Violations of §20(a) of the Exchange Act Against the Individual Defendants ..................................................................................................................69

PRAYER FOR RELIEF ..............................................................................................................70

JURY DEMAND .........................................................................................................................70

Lead Plaintiffs the John Fogel Revocable Trust, Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Macomb County Intermediate Retirees Medical Benefits Trust (collectively, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and all other persons similarly situated, by Lead Plaintiffs' undersigned attorneys, for Lead Plaintiffs' amended complaint for violations of the federal securities laws against Defendants (defined below), allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, the review and analysis of: (i) Securities and Exchange Commission ("SEC") filings made by Lululemon Athletica Inc. ("Lululemon" or the "Company"); (ii) press releases, public statements, public letters, and other publications disseminated by, or concerning, Lululemon; (iii) transcripts of investor conference calls with Lululemon senior management; (iv) information posted on Lululemon's corporate website; and (v) securities analyst reports concerning Lululemon. The investigation of Plaintiffs' attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of: (1) all purchasers of Lululemon common stock between December 8, 2023 and July 24, 2024, inclusive (the "Class Period") (*i.e.*, the "Common Stock Class"); and (2) all purchasers of options on Lululemon common stock during the Class Period (*i.e.*, the "Options Class").[1]

---

[1]      Capitalized terms used in this section are defined later in this complaint.

2.      Lead Plaintiffs are asserting claims on behalf of the Common Stock Class and the Options Class against Lululemon and certain of its senior executives and/or directors under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

3.      Lululemon is an athleisure apparel company.  The Company's most lucrative market before and during the Class Period was U.S. women's products.  To sustain and grow the Company's U.S. women's business during the Class Period, Lululemon had to ensure that its inventory allocation – *i.e.*, the sizes and colors of U.S. women's products that the Company intended to sell to customers – was sufficient to meet expected customer demand.  Thus, Defendants' statements about Lululemon's inventory were highly material to investors.

4.      Before the Class Period, in January 2023, Defendants told analysts and investors that Lululemon needed to reduce its overall inventory level after carrying more inventory than usual in FY22.  Defendants' stated goal was to align Lululemon's inventory with expected demand by the start of the Class Period.

5.      When Defendants presented Lululemon's 3Q23 financial results post-market close on December 7, 2023, they falsely stated that Lululemon had a sufficient "quality and quantity" of inventory, that Lululemon's increased demand from younger U.S. women had led to market share gains, and that the inventory allocation demanded by Lululemon's customers was unchanged. Unbeknownst to investors, however, Defendants' statements were materially false and misleading when made because Lululemon lacked sufficient quantities of sizes 0 to 4 and color for U.S. women's products to capture the increased demand from younger U.S. women that Defendants purposely solicited through a back-to-school marketing campaign in 2023.

6.      Defendants were forced to admit to Lululemon's inventory allocation failure on March 21, 2024, because U.S. growth had materially slowed as a result of the Company lacking sufficient inventory of sizes 0 to 4 and color in U.S. women's products to meet the expected demand from the Company's marketing efforts.  This meant that Lululemon's 3Q23 market share gains from younger U.S. women had been unsustainable, and that the inventory allocation mix demanded by customers had, in fact, materially changed.  In response to this partial corrective disclosure, Lululemon's common stock price declined by $75.65 per share, or ~15.8%.

7.      Defendants knew, or recklessly disregarded, that Lululemon's inventory allocation for U.S. women's products was materially deficient by December 7, 2023, for three reasons.

8.      First, by January 2023, Lululemon had purchased and implemented the Nedap System throughout the Company's operations.  According to comments made by two Lululemon executives in January 2023, the Nedap System is a cloud-based inventory management system that gave Defendants "perfect inventory visibility" into Lululemon's inventory allocation in real-time by at least January 2023.  As a result, by December 7, 2023, Defendants could easily check Lululemon's inventory allocation to ascertain with 100% accuracy whether the Company had sufficient sizes 0 to 4 and colors of U.S. women's products to meet expected demand.

9.      Second, by July 2023, Lululemon was engaged in a targeted marketing campaign aimed towards younger U.S. women that featured smaller sizing and color.  In August and September 2023, Defendants told investors and analysts that this marketing campaign had succeeded in driving market share gains for the Company, meaning Defendants were aware of this marketing campaign and the corresponding increase in demand for smaller sizes and colors that it had facilitated.  Thus, Defendants knew that Lululemon was experiencing significantly increased demand for smaller sizes and colors in U.S. women's products by December 7, 2023.

10.    Third, Defendants admitted in mid-2024 that Michelle (Sun) Choe ("Choe") – an executive officer of Lululemon before and during the Class Period who reported directly to defendant McDonald – had failed to purchase sufficient sizing or color of U.S. women's products in August 2023 to align Lululemon's inventory with the expected demand increase for those items facilitated by the 2023 marketing campaign.  Thus, when speaking about Lululemon's inventory at the start of the Class Period, Defendants knew, or recklessly disregarded, that the Company had failed to purchase sufficient quantities of U.S. women's products inventory.

11.    After admitting to Lululemon's inventory allocation failure on March 21, 2024, Defendants continued to deceive investors that same day by falsely stating that the Company's inventory allocation in sizes 0 to 4 and color for U.S. women's product would "continue to improve starting in Q2[,]" *i.e.*, by May 2024.  In reality, and unbeknownst to investors, Choe's inventory allocation failure meant that the Company could not quickly obtain sufficient additional inventory of smaller sizes and color in U.S. women's products in 2Q24 or thereafter to satisfy demand.

12.    On May 21, 2024, Lululemon announced that Choe was leaving the Company, that her executive role was not being replaced, and that the Company needed to reorganize to better align its design and merchandising decisions.  Analysts viewed Choe's departure and the related changes as meaning that there was no quick fix to Lululemon's inventory allocation failure for U.S. women's products.  In response to this partial corrective disclosure, Lululemon's common stock price declined by $23.35 per share, or approximately 7.2%.

13.    In addition, on March 21, 2024 and on June 5, 2024, Defendants continued to deceive Lululemon's investors by falsely stating that "innovation" in U.S. women's leggings – specifically the upcoming Breezethrough legging – would reinvigorate U.S. growth and prevent the Company's inventory allocation failure from further harming Lululemon's FY24 performance.

- 4 -

14.     But in making those statements, Defendants knew that the Breezethrough legging had no chance of driving material revenue or profit growth at Lululemon in FY24 because these leggings suffered from obvious design flaws and were internally intended to only be a "test and learn" in FY24, not a new full product launch.

15.     That is precisely what investors belatedly learned.  Lululemon launched the Breezethrough legging on July 9, 2024, and then pulled it on July 24, 2024, due to fierce customer backlash.  Analysts were dismayed because Defendants misled them into believing that these leggings would contribute almost 9% to Lululemon's near-future earnings.  As Defendants later admitted, however, these leggings were a "test and learn" that had never been intended to materially contribute to Lululemon's revenue or profit in FY24.  In response to the July 24, 2024 announcement that the Breezethrough legging had been pulled, Lululemon's common stock price declined by $24.74 per share, or approximately 9.1%.

16.     During the Class Period, the Individual Defendants were personally motivated to conceal Lululemon's inventory allocation failure and the related slowdown in U.S. growth from investors.  Specifically, just ten days after the Class Period began – with Lululemon's common stock price trading near its all-time high – the Individual Defendants took advantage of the artificial inflation in the price of Lululemon's common stock and sold 25.3% (defendant McDonald) and 15.6% (defendant Frank) of their personally held shares of Lululemon common stock for combined gross proceeds of over $13.2 million and net profits of over $9.7 million.  None of the Individual Defendants' December 2023 sales were made pursuant to a Rule 10b5-1 trading plan.

17.     In contrast, the Company's investors – Lead Plaintiffs and the Common Stock Class and the Options Class – suffered staggering losses in their Lululemon investments during the Class Period due to Defendants' alleged fraud as described herein.

## JURISDICTION AND VENUE

18.　　Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5.

19.　　This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

20.　　Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Dissemination of materially false and misleading information by Defendants occurred in this District.

21.　　In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, telephonic communications, and the facilities of the national securities markets.

## PARTIES

22.　　Lead Plaintiff the John Fogel Revocable Trust (the "Trust") purchased during the Class Period: (1) Lululemon common stock; and (2) call options on Lululemon common stock, as set forth in the Trust's certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby.  *See* ECF No. 28-2.

23.　　Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Macomb County Intermediate Retirees Medical Benefits Trust each purchased Lululemon common stock during the Class Period, as set forth in their certifications previously filed with the Court and incorporated herein by reference, and have been damaged thereby.  *See* ECF No. 22-2.

24.　　Defendant Lululemon designs, distributes, and retails technical athletic apparel, footwear, and related accessories.  Lululemon's common stock is traded on the Nasdaq Global Select Market ("NASDAQ") securities exchange under the symbol "LULU."  According to

Lululemon's Form 10-Q for the fiscal quarter ended October 29, 2023 ("3Q23"), which was filed with the SEC after the market closed on December 7, 2023, and signed and/or certified by defendants McDonald and Frank (the "3Q23 Form 10-Q"), the Company had 121,074,786 shares of common stock outstanding as of December 1, 2023. According to the 3Q23 Form 10-Q, Lululemon's "fiscal year ends on the Sunday closest to January 31 of the following year," meaning that fiscal year 2023 ("FY23") ran from January 30, 2023 to January 28, 2024. Shortly before the Class Period began, on October 18, 2023, Lululemon was added to the S&P 500 in the "Consumer Discretionary" sector.

25.    Defendant Calvin McDonald ("McDonald") has served as the Company's Chief Executive Officer ("CEO") and as a director on Lululemon's board of directors (the "Board") since August 2018. According to the Form DEF14A filed by Lululemon on April 25, 2024 (the "2024 Form DEF14A"), defendant McDonald has been an executive officer of Lululemon during his tenure as CEO. Defendant McDonald certified and/or signed each of the Company's Form 10-Q's and Form 10-K filed during the Class Period. Defendant McDonald spoke at numerous Lululemon investor conferences during the Class Period.

26.    Defendant Meghan Frank ("Frank") has served as the Company's Chief Financial Officer ("CFO") since November 2020. Defendant Frank joined the Company in 2016 as a senior vice president, financial planning and analysis, and served as interim co-CFO from April 2020 until her appointment to CFO. According to the 2024 Form DEF14A, defendant Frank has been an executive officer of Lululemon during her tenure as CFO. Defendant Frank certified and/or signed each of the Company's Form 10-Q's and Form 10-K filed during the Class Period. Defendant Frank spoke at numerous Lululemon investor conferences during the Class Period.

27.     Defendants McDonald and Frank are collectively referred to herein as the "Individual Defendants."

28.     Lululemon and the Individual Defendants are collectively referred to herein as "Defendants."

29.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

30.     Each of the above officers of Lululemon, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Each of the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

31.     As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, and which is governed by the provisions of the federal securities laws, each of the Individual

Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. Each of the Individual Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions and/or Board membership with Lululemon, the Individual Defendants each had access to the adverse undisclosed information about Lululemon's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Lululemon and its business materially false and misleading.

33. Each of the Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual

Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

34.     Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Lululemon common stock and/or options on Lululemon common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Lululemon's financial reporting, business, operations and management and the intrinsic value of Lululemon's common stock and/or options on Lululemon common stock; and (ii) caused Lead Plaintiffs and the Class to purchase Lululemon publicly-traded common stock and/or options on Lululemon common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Lululemon and Its Business

35.     Lululemon is an "athleisure" retailer that is headquartered in Vancouver, Canada, and is incorporated under Delaware law.

36.     According to the Company's Form 10-K for FY23, which was signed by Defendants and filed on March 21, 2024 (the "2023 Form 10-K"), Lululemon designs, distributes, and retails athletic and leisure apparel, footwear, and accessories.

37.     According to the 2023 Form 10-K, Lululemon did not follow the standard fiscal calendar before or during the Class Period.

38.     Instead, the Company's fiscal quarters during FY23 took place during the following times: (1) the first fiscal quarter of FY23 ran from January 30, 2023 to April 30, 2023 ("1Q23"); (2) the second fiscal quarter of FY23 ran from May 1, 2023 to July 30, 2023 ("2Q23"); (3) 3Q23 ran from July 31, 2023 to October 29, 2023; and (4) the fourth fiscal quarter of FY23 ran from October 30, 2023 to January 28, 2024 ("4Q23").

39.     Likewise, during fiscal year 2024 ("FY24"), Lululemon's fiscal quarters took place during the following times: (1) the first fiscal quarter of FY24 ran from January 29, 2024 to April 28, 2024 ("1Q24"); (2) the second fiscal quarter of FY24 ran from April 29, 2024 to July 28, 2024 ("2Q24"); and (3) the third fiscal quarter of FY24 ran from July 29, 2024 to October 27, 2024.

**U.S. Women's Products Was Lululemon's Key Market Before and During the Class Period**

40.     Before and during the Class Period, U.S. women's products was Lululemon's most important and lucrative market.

41.     According to the Company's Form 10-K for the fiscal year ended January 29, 2023 ("FY22"), which was signed by Defendants and filed on March 28, 2023 (the "2022 Form 10-K"), "*our largest customer group is made up of guests who shop our women's range[.]*"[2]

42.     The 2022 Form 10-K states that 350 of Lululemon's 655 Company-operated stores, approximately 54%, were located in the U.S. during FY22.

43.     The 2022 Form 10-K also states that $5,654,343,000 of Lululemon's net revenue for FY22, or approximately 70% of Lululemon's total net revenue for FY22, came from sales to customers in the U.S.  The remaining sales in FY22 came from Canada, China, and the Rest of World, with no other segment accounting for more than 15% of Lululemon's net revenue for FY22.

44.     In addition, the 2022 Form 10-K states that $5,259,803,000 of Lululemon's net revenue for FY22, or approximately 65% of Lululemon's total net revenue for FY22, came from sales of women's products.  The remaining sales in FY22 came from men's products and "Other," with neither accounting for more than 25% of Lululemon's net revenue for FY22.

---

[2]     Unless otherwise noted, all emphasis is added.

45.     According to the 2023 Form 10-K, Lululemon's "***operations in the Americas are core to our business*** and we aim to continue to grow our net revenue in this market through ongoing product innovation and by building brand awareness."

46.     The 2023 Form 10-K states that 367 of Lululemon's 711 Company-operated stores, approximately 52%, were located in the U.S. during FY23.

47.     The 2023 Form 10-K also states that $6,346,392,000 of Lululemon's net revenue for FY23, or approximately 66% of Lululemon's total net revenue for FY23, came from sales to customers in the U.S.  The remaining sales in FY23 came from Canada, China, and the Rest of World, with none accounting for more than 15% of Lululemon's net revenue for FY23.

48.     In addition, the 2023 Form 10-K states that $6,147,372,000 of Lululemon's net revenue for FY23, or approximately 64% of Lululemon's total net revenue for FY23, came from sales of women's products.  The remaining sales in FY23 came from men's products and "Other," with neither accounting for more than 25% of Lululemon's net revenue for FY22.

49.     Thus, the 2022 and 2023 Form 10-K's establish that, at all relevant times before and during the Class Period, Lululemon's sales of U.S. women's product represented the Company's key market for earning revenue and profit.

50.     Defendant McDonald repeatedly told analysts and investors the same, *i.e.*, that U.S. women's products was Lululemon's key market.

51.     For example, in connection with announcing Lululemon's financial results for FY22 on March 28, 2023 (the "March 2023 Conference"), defendant McDonald described Lululemon's U.S. business as "a key market within North America."

52.     Likewise, defendant McDonald stated during an interview with *CNBC* on December 6, 2024 (the "December 2024 Interview") that "***the opportunity for [Lululemon] is very specific.  It's women's U.S.***"

53.     In addition, following his presentation at the 2025 National Retail Federation ("NRF") Retail's Big Show Conference in New York City earlier that day, Defendant McDonald stated during an interview with *CNBC* on January 14, 2025 that "***[Lululemon's] stock price is a reflection of, of the U.S. business***."

54.     Accordingly, before and during the Class Period, analysts and investors were told by Defendants that Lululemon's revenue and profit from U.S. women's products sales were the most critical factors in assessing the Company's financial performance.

**Effective Inventory Management Was Crucial for Lululemon to Generate Revenue and Profit From U.S. Women's Products During the Class Period**

55.     Before and during the Class Period, Defendants admittedly paid constant and careful attention to the quality and quantity of Lululemon's inventory to ensure that the Company had enough sizes and colors to match expected demand, particularly for U.S. women's products.

56.     If an athleisure company like Lululemon purchases too much inventory relative to expected demand, then revenue and profit will be negatively impacted because the Company will be forced to sell the excess inventory at a discounted price, which compresses profit margins.

57.     Conversely, if Lululemon purchases too little inventory relative to expected demand, then revenue and profit will be negatively impacted because the Company will miss out on sales opportunities by not having the correct inventory allocation.

58.     For this reason, at all relevant times before and during the Class Period, Defendants were actively managing and monitoring Lululemon's inventory level and composition to ensure that it closely matched the Company's expected demand.

- 13 -

59.     Indeed, as explained by defendant Frank during the March 2023 Conference, "[o]ur goal overall is to manage our inventory in line with our revenue growth[.]"

60.     Because effective inventory management was such a critical component of ensuring sustainable revenue and profit growth, Defendants spoke about Lululemon's then-current inventory management efforts in each Form 10-Q, Form 10-K, and investor conference call during FY22 and FY23.

61.     As a result, analysts were highly focused on Lululemon's relative inventory level and composition at all times in FY22 and FY23.  For example, Barclays stated in a March 27, 2023 report on Lululemon that "*[i]nventory will be the focus*" of Lululemon's next earnings announcement.

62.     Likewise, Deutsche Bank stated in a June 2, 2023 report on Lululemon that "[m]anagement commented that they feel comfortable with inventory levels and that the company is 'well positioned to continue to fulfill guest demand.'"

63.     Lululemon's inventory management was also covered by the media before and during the Class Period.  For example, a March 28, 2023 *Reuters* article entitled "Lululemon projects upbeat 2023 on strong demand, easing inventory" stated that "Lululemon is also making good progress in clearing its excess inventories."

64.     In addition, on March 29, 2023, defendant McDonald stated to *CNBC* in an interview that he was actively focused on managing Lululemon's inventory levels for 3Q23 and 4Q23, *i.e.*, the start of the Class Period, specifically stating that "we've been beating our guidance on managing that inventory down without markdowns through full price sale . . . we've guided again in this quarter *having inventory . . . in line with sales at the back half of the year*."

65.    Furthermore, on September 12, 2023, in response to a comment that "Wall Street more broadly looking at retail has been very focused on inventories, what that's meant for gross margins," defendant McDonald stated to *CNBC* in an interview that he "***wanted to make sure that [Lululemon] had our inventory here to satisfy the demand that we were seeing behind the brand. And we did that***."

66.    Thus, Defendants' statements demonstrate that they were actively managing and monitoring Lululemon's inventory composition and quantity at all relevant times before and during the Class Period.

67.    Accordingly, before and during the Class Period, analysts and investors paid careful attention to Lululemon's inventory management performance and the relative composition and quantity of Lululemon's then-current inventory levels.

**Analysts and Investors Were Highly Attuned to the Composition and Quantity of Lululemon's Inventory by the Start of the Class Period**

68.    By June 2022, Lululemon had deployed a purposeful strategy to be over-inventoried after experiencing supply chain disruptions in 2020 and 2021 caused by the COVID-19 global pandemic.  In response, analysts and investors were closely following the Company's inventory levels and related efforts to manage inventory closer to expected demand.

69.    During Lululemon's June 2, 2022 investor conference call to announce the Company's financial results for the first fiscal quarter of 2022, defendant Frank told investors that "inventory grew 74% versus last year" as the Company tried to "mitigate industry-wide supply chain issues[.]"

70.    Likewise, during Lululemon's September 1, 2022 investor conference call to announce the Company's financial results for the second fiscal quarter of 2022, defendant Frank told investors that "inventory grew 85% versus last year[.]"  On the same call, defendant

McDonald acknowledged that "for much of [2021], we were under-inventoried and not able to fully maximize our business."

71.     In addition, during Lululemon's December 8, 2022 investor conference call to announce the Company's financial results for the third fiscal quarter of 2022, defendant McDonald told investors that "in terms of inventory, we ended quarter 3 with dollar inventory up 85% on a 1-year basis . . . As we discussed, our inventory levels were too lean [in 2021], and we made the strategic decision to build inventories this year, which enabled the strong top line growth we have delivered."

72.     Defendant Frank stated on the same call that Lululemon had "strategically positioned inventory to be able to capture guest demand this year."

73.     By the start of FY23 in January 2023, Defendants recognized that Lululemon's rapid inventory growth in FY22 posed a risk to revenue and profit.  This meant that Lululemon had to reduce its overall inventory to better match expected demand at the start of FY23.  For that reason, in announcing Lululemon's FY22 financial results during the March 2023 Conference, defendant Frank told investors that "[i]n 2023, our inventory growth will continue to moderate, while we maintain our full price selling model, and we remain well positioned to fulfill guest demand."

74.     Unsurprisingly, investors and analysts were highly focused on Lululemon's inventory management performance as FY23 began.  For example, on March 28, 2023, a Wells Fargo analyst issued a report on Lululemon and stated that "1Q ending inventories are guided +30-35%, **with alignment with sales aimed for 2H23**.  As we previewed, **this was the key to the print**."

75.     Lululemon's inventory management was again a key concern of analysts and investors when the Company reported financial results for 1Q23 on June 1, 2023.  During the

accompanying investor conference call that day, defendant Frank told investors that "we continue to expect inventory growth to be relatively in line with sales growth in the second half of 2023" and that "we're well positioned to continue to fulfill guest demand."

76.    When defendant Frank was pressed by an analyst from Goldman Sachs on the June 1, 2023 investor call for 1Q23 to "elaborate on your inventory outlook," defendant Frank reiterated that "our expectation is we'll be . . . ***inventory in line with sales in the second half of [2023]***."

77.    Likewise, when Lululemon reported financial results for 2Q23 on August 31, 2023, in the accompanying investor conference call (the "2Q23 Earnings Call") defendant Frank told investors that "our inventory growth continued to moderate about 14% versus our guidance of approximately 20%, and it remains well positioned from both a level and composition standpoint."

78.    Later during the 2Q23 Earnings Call, an analyst from JP Morgan asked "could you just speak to the overall health and composition of your current inventory position as we head into the back half" and defendant Frank responded that "in terms of how we're looking at inventory for the balance of the year, at the end of Q3, we're expecting high single to low double digits. ***And then in Q4, end of Q4, relatively in line with sales as we move into 2024.*** So I would say overall, we're really pleased with the currency and also the level of our inventory."

79.    Accordingly, by the start of the Class Period in December 2023, analysts and investors were misled into believing that Lululemon had succeeded in matching the Company's inventory allocation to expected demand.

80.    In other words, by the start of the Class Period, Defendants had conditioned analysts and investors to be highly focused on the composition and quantity of Lululemon's inventory, and its alignment with customer demand, thereby rendering Defendants' statements on these topics as of December 7, 2023, highly material.

- 17 -

**By January 2023, Defendants Intentionally Shifted Lululemon's Inventory System to a
Cloud-Based Program That Gave Defendants Accurate Real-Time Inventory Visibility**

81.     Starting in September 2022, Defendants had the ability to view and manage
Lululemon's inventory composition and quantity in real-time through the Company's purchase
and implementation of the Nedap (defined below) iD Cloud inventory management system (the
"Nedap System") throughout the Company's North American operations.

82.     Nedap N.V. ("Nedap") is a publicly-traded company based in the Netherlands that
is the global leader in radio frequency identification ("RFID") based inventory solutions.

83.     The Nedap System is a cloud-based software solution for inventory management
that utilizes RFID technology.

84.     RFID technology allows a device to read inventory information contained in a
wireless tag from a distance without physical contact or line of sight.

85.     At all relevant times before and during the Class Period, and by at least January
2023, Lululemon attached a small RFID chip to the tag on each inventory item warehoused in the
Company's distribution centers and located in the Company's physical stores.

86.     According to the 2023 Form 10-K, Lululemon had two distribution centers in the
U.S. during FY23, with the largest located in Groveport, Ohio, which was the Company's lone
wholly-owned distribution center world-wide during the Class Period.

87.     According to an article on Nedap's website entitled "iD Cloud Supply Chain," the
Nedap System allows customers like Lululemon to "[m]anage the entire supply chain with accurate
stock information and automate product registration at warehouses and distribution centers."

88.     Further, this article states that the Nedap System links to "one system holding all
stock information in a central repository."

89.     According to an article on Nedap's website entitled "iD Cloud Web," a key feature of the Nedap System is that it gives customers like Lululemon the "***instant***" ability to "***trigger replenishment of missing sizes***" from retail stores.

90.     Further, this article states that "iD Cloud Web is designed to quickly inform you so you can benchmark, analyze and ***improve the stock accuracy and product availability in your stores***."

91.     In addition, this article states that the Nedap System allows customers like Lululemon to "***[e]asily monitor the average on-shelf availability of your inventory. The percentage of on-shelf availability gives an indication of whether the most relevant sizes of articles are available for customers on the sales floor***."

92.     According to an article on Nedap's website entitled "iD Cloud Store," the Nedap System gives customers like Lululemon "[r]eal-time inventory visibility . . . [w]hether inventory is located on your sales floor, stock room or displayed, ***the Nedap iD Cloud store solution creates real-time visibility of every item, in every single store***."

93.     According to an article on Nedap's website entitled "iD Cloud Platform," the Nedap System gives customers like Lululemon the ability to "***[v]iew your stock across the entire network of your supply chain and have items move between your stores, distribution centres and e-commerce without losing sight of any single item. Perfectly match demand and supply anywhere, at any time.***"

94.     According to a presentation entitled "Nedap iD Cloud" on Nedap's website, the Nedap System allows customers like Lululemon "***to keep track of every single item using RFID technology,*** from the moment it leaves the production factory to the exact moment the item gets shipped, sold or when it's returned."

95. Thus, Lululemon's purchase and implementation of the Nedap System by at least January 2023 meant that, by the start of the Class Period, Defendants had the instant ability to check Lululemon's inventory in real time to ascertain whether the Company had enough U.S. women's products in sizes 0 to 4 and color to meet expected demand.

96. This is confirmed by the January 12, 2023 press release issued by Nedap entitled "Lululemon partners with Nedap to advance RFID technology across stores globally" (the "Nedap Press Release").  Specifically, the Nedap Press Release states that the Nedap System "helps retailers achieve *perfect inventory visibility*."

97. In addition, according to the Nedap Press Release, the Nedap System provided Lululemon with "*real-time item-level insights into their stock levels and the exact location of each item*."

98. According to the Nedap Press Release, in August 2022 Lululemon selected Nedap "as their new provider for the deployment of Nedap iD Cloud which will enhance [Lululemon's] omni-guest experience across its 600+ stores globally *by optimizing product availability.*"

99. Further, according to the Nedap Press Release, "*Nedap's iD Cloud platform is a crucial pillar to unlock real-time inventory data so that stores have the right product assortment available on their floor[.]*"

100. In other words, as confirmed by the Nedap Press Release, by implementing the Nedap System, Defendants had the capability by the start of the Class Period to instantly know: (1) if specific sizes and colors for U.S. women's products were being purchased at an increased level of frequency, *i.e.*, increased demand; (2) how much of these specific sizes and colors remained available in Lululemon's inventory to satisfy the increased level of demand for these

U.S. women's products; and (3) that Lululemon's inventory lacked sufficient amounts of these specific sizes and colors of U.S. women's products to meet continued increased demand.

101.    According to the Nedap Press Release, the Nedap System was successfully deployed to Lululemon's North American stores by September 2022, and was available globally by January 2023.

102.    In light of the significant capabilities of the Nedap System, Lululemon publicly touted the positive benefits that the Nedap System provided to the Company.

103.    The Nedap Press Release quoted Carl Barker ("Barker"), Lululemon's Vice President of Global Omni Programs. Specifically, Barker is quoted in the Nedap Press Release as stating that the Nedap System now allowed Lululemon to "leverage real-time, accurate data" and to possess "accurate real-time store inventory visibility," stating, in pertinent part, as follows:

> Our guests are at the center of everything that we do, and we are hyper-focused on creating strong guest connections through seamless store and online experiences. **With Nedap's iD Cloud solution, we can leverage real-time, accurate data** to enable our in-store educators to spend even more time engaging and connecting with our guests. Having a fully mobile cloud solution in our stores greatly contributes to this experience. Online, RFID continues to elevate our digital experience, offering **accurate real-time store inventory visibility and powering key fulfillment experiences** such as buy online, pickup in store (BOPIS).

104.    On January 17, 2023, Barker participated in a panel discussion entitled "No Future in Retail without RFID: How Lululemon uses RFID to create inventory visibility produced by Nedap" at the 2023 NRF Retail's Big Show with Ailen Bilharz ("Bilharz"), a Nedap executive who is also quoted in the Nedap Press Release, and Liam Kerney ("Kerney"), Lululemon's Vice President, Global Retail Engineering and Services (the "2023 NRF Panel Discussion").

105.    The NRF Retail's Big Show is the world's leading annual retail event and the NRF is the world's largest retail trade association.

106.   As described above in ¶53, defendant McDonald presented at the 2025 edition of the NRF Retail's Big Show.

107.   In addition, Nicole Neuburger ("Neuburger"), Lululemon's Chief Brand Officer, also presented at the 2025 NRF Retail's Big Show.

108.   At the outset of the 2023 NRF Panel Discussion, Barker stated that he is "responsible for all of [Lululemon's] retail technology that sits across our stores globally, in addition to our ***inventory***, digital fulfillment and omni[channel] fulfillment programming."

109.   Likewise, at the outset of the 2023 NRF Panel Discussion, Kerney stated that he "lead[s] the team that's responsible, partnering closely with Carl [Barker]'s team, on the technology and engineering delivery side for the technology that shows up in our stores [including] . . . RFID[.]"

110.   During the 2023 NRF Panel Discussion, Barker explained that adopting the Nedap System meant Lululemon had near-perfect inventory management capabilities by the start of the Class Period, including the ability to assess the Company's inventory to instantaneously know whether a specific size and color for a U.S. product is available in any of Lululemon's stores or distribution centers, stating, in pertinent part, as follows:

> **Bilharz:** Talk to me a little bit about how RFID today is woven into day-to-day business operations. Start there first and I'd love to hear from a tech ops perspective as well.

> **Barker:** Yeah, I mean very into woven into everything we do from a store's perspective. So, right from the moment that inventory lands in our stores to the moment that it leaves with a guest – shipping, receiving, transacting, fulfillment, yeah, it's pretty, pretty interwoven into everything that we do. Weekly counts, we now count our inventory store, sorry, our stores on a weekly basis now. ***And that's significant because what we're actually doing is taking that count information and directly impacting our [Enterprise Resource Planning] so that we can ensure that our planning allocation teams . . . have an ability or a visibility to be able to respond to things that we might not have necessarily already detected.*** So, I'd say that and then from a guest experience perspective, inventory visibility. We believe wholeheartedly in RFID and, and our ability to be able to showcase down to the

last unit. ***And, so, if you're ever on our website or visiting our app, we'll showcase store inventory and what most people don't recognize is it's an unadulterated view of inventory down to the last unit. I landed in New York and suddenly I realized I needed to go grab a shirt. It's actually this one [currently being worn], and the only place that actually had it was down in our Flat Iron store and it was a 35 minute walk, when in New York, walk, and I'm like, will I commit 35 minutes to go get this shirt. Oh, yeah, I will because I know that with RFID that it's there and sure enough it was there.***

111.    In other words, Barker admits that by no later than January 2023, Defendants had the ability to instantly and accurately ascertain whether Lululemon's inventory contained sufficient sizing and color for specific U.S. women's products.

112.    Also during the 2023 NRF Panel Discussion, Kerney stated that the Nedap System is "a mission critical system for [Lululemon]."

113.    Likewise, during the 2023 NRF Panel Discussion, Kerney admitted that Lululemon's senior executives were involved in adopting the Nedap System, stating that "regardless of reporting lines, it's one team that's clear on the outcomes we're driving towards and that's really been game changing for us. So, ***it's alignment at all levels*** not just Carl [Barker] and I but our respective teams, ***our senior Executives***, that's been a really important ingredient for us as well."

114.    Accordingly, by the start of the Class Period, as explained by Barker and Kerney, the Nedap System gave Defendants the ability to immediately and accurately ascertain whether Lululemon had sufficient sizing and color for U.S. women's products to meet expected demand.

**Lululemon Implemented a Back-to-School Marketing Campaign Directed Towards Younger U.S. Women Beginning in July 2023**

115.    In the summer of 2023, Defendants caused Lululemon to engage in a back-to-school marketing campaign aimed at younger U.S. women that featured small-sized models and a variety of color across Lululemon's U.S. women's products offerings. This campaign consisted

- 23 -

of, *inter alia*, the usage of popular social media channels, paid partnerships with "influencers," paid affiliate advertising, partnerships with large universities, and other forms of advertising.

116.    As JP Morgan stated in an April 16, 2024 report on Lululemon (the "April 2024 JP Morgan Report"), during FY23 the Company had engaged in "***an intentional and successful strategy to introduce younger guests to the brand***" using events like the Company's "***first Back to School marketing campaign launched in 2023 . . . to drive brand awareness . . . across the college age demographic***."

117.    The April 2024 JP Morgan Report further stated that these marketing efforts resulted in "***strong growth experienced within the younger customer demographic[.]***"

118.    Lululemon's 2023 back-to-school marketing campaign aimed towards younger U.S. women began by at least July 2023.

119.    On Lululemon's official Instagram page, the Company posted on July 21, 2023 about the 2023 back-to-school marketing campaign by linking to a video curated by a popular social media influencer.

120.    The Instagram video for the 2023 back-to-school marketing campaign posted by Lululemon depicts multiple smaller sized U.S. women's product in a variety of color options, including Moonlit Magenta, Java, Pipe Dream Blue, Forest Green, and Dark Lavender.

121.    Lululemon's Instagram post on July 21, 2023, demonstrates that Defendants knew, or recklessly disregarded, that the 2023 back-to-school marketing campaign was soliciting increased demand for smaller sizes and color of U.S. women's products.

122.    In fact, during July and August 2023, Lululemon's official Instagram account frequently responded to comments to this Instagram post that asked for the specific color names of the smaller sized U.S. women's products modeled in the video.  These exchanges further

demonstrate that the Company understood the importance of color to the younger U.S. customers targeted by this marketing campaign.

123.    Lululemon's 2023 back-to-school marketing campaign aimed towards younger U.S. women also included hiring other social media influencers to promote paid partnerships for the Company's U.S. women's products.  These influencer posts were made in July and August 2023 across a variety of social media platforms, including Instagram, TikTok and YouTube, and, like Lululemon's July 21, 2023 Instagram post, featured smaller sized models and a variety of color for U.S. women's products.

124.    Lululemon also conducted the 2023 back-to-school marketing campaign through affiliate posts on popular websites.  These posts included the July 27, 2023, *E! News* article entitled "These Under $99 Lululemon Back-to-School Styles Are Anything But Textbook," which stated that Lululemon's 2023 back-to-school collection included U.S. women's products modeled in smaller sizes that emphasized numerous color options.  For example, Lululemon's "Wunder Train High-Rise Tight" was advertised as coming in "19 colors" and Lululemon's "Hotty Hot High-Rise Lined Short" was advertised as coming in "17 colors[.]"

125.    Likewise, on August 1, 2023, Lululemon sponsored an article on *Entertainment Tonight* entitled "Lululemon Reimagines the Vintage Collegiate Aesthetic With New Back-to-School Collection," which featured U.S. women's products modeled in smaller sizes and included various color options.

126.    In addition, in August 2023, Lululemon U.S. women's products were placed in high-profile university campuses such as the Ohio State University and the University of California, Los Angeles, to drive further brand awareness among the college-aged demographic.

127.    Thus, by the start of the Class Period, Defendants understood that the back-to-school marketing campaign had solicited younger U.S. women to purchase increased amounts of smaller sized and colorful U.S. women's products by at least September 2023, *i.e.*, during 3Q23.

128.    Indeed, in the months leading up to the start of the Class Period, Defendants repeatedly commented on the back-to-school marketing campaign and related positive impact on U.S. market share.  For example, on August 31, 2023, during the 2Q23 Earnings Call, defendant Frank described the response to Lululemon's 2023 marketing campaign towards younger U.S. women that started during 2Q23 by stating that "I'm also excited to see our sales strength continuing into Q3 ***as guests are responding well to our back-to-school and early fall product innovations***."

129.    Thus, defendant Frank acknowledged during the 2Q23 Earnings Call that she was aware that Lululemon was actively soliciting younger U.S. women through advertisements focused on smaller sizes and color, and that this marketing campaign had caused increased expected demand for those sizes and colors of U.S. women's products.

130.    In addition, on September 12, 2023, during the Goldman Sachs Global Retailing Conference (the "September 2023 Conference"), defendant McDonald stated that "***we just saw a really good response to our back-to-school messaging, leveraging some of the items that resonate and work for that across those categories***.  So there's a variety of drivers in the North American business that really we saw a nice momentum coming out of a very strong quarter."

131.    Thus, defendant McDonald acknowledged during the September 2023 Conference that he understood that Lululemon was engaged in the 2023 back-to-school marketing campaign and the related "response" that the Company's younger U.S. customers had to that campaign, *i.e.*, increased demand for smaller sizes and color in U.S. women's products.

132.     Likewise, during the 3Q23 Earnings Call, defendant McDonald stated that "***guests responded well to our back-to-school product innovations and our strategies to connect with younger guests through dedicated digital marketing and targeted activations[.]***"

133.     Thus, defendant McDonald acknowledged during the 3Q23 Earnings Call that he was aware that Lululemon was actively soliciting younger U.S. women through advertisements focused on smaller sizes and color, and that this marketing campaign had caused increased expected demand for those sizes and colors of U.S. women's products.

134.     Accordingly, Defendants understood by December 7, 2023, that during 4Q23 and FY24 Lululemon's expected customer demand included significantly increased interest in smaller sizes and a variety of color in U.S. women's products, meaning that Defendants were keenly focused by the start of the Class Period on ensuring that Lululemon had sufficient inventory of these types of U.S. women's products to ensure continued U.S. growth.

**Lululemon Did Not Purchase Enough Sizes 0 to 4 and Colors of U.S. Women's Products in FY23 to Capture the Increased Demand From the 2023 Marketing Campaign**

135.     According to the 2023 Form 10-K, to ensure an adequate inventory supply of U.S. women's products, Lululemon had to forecast inventory needs and place orders with manufacturers based on the Company's estimates of future demand.

136.     As explained above in ¶¶115-134, by August 2023, Defendants knew, or recklessly disregarded, that the 2023 back-to-school marketing campaign meant Lululemon expected significantly increased demand for sizes 0 to 4 and color in U.S. women's products in 3Q23, 4Q23, and FY24.

137.     In August 2023, Choe was Lululemon's Chief Product Officer ("CPO").  According to the 2024 Form DEF14A, in her role as CPO, Choe was an executive officer of the Company who was responsible for "leading the merchandising and design teams for the company."

138.    According to the press release filed as an exhibit to the Form 8-K filed by Lululemon on July 24, 2018, to announce the hiring of defendant McDonald as CEO (the "2018 Form 8-K"), Choe "will report to Mr. McDonald." Thus, the 2018 Form 8-K confirmed that Choe reported directly to defendant McDonald before and during the Class Period.

139.    The 2018 Form 8-K further stated that, before defendant McDonald was hired, Choe had been one of three executives (with Burgoyne) running Lululemon's day-to-day operations starting in February 2018 while the Company engaged in a CEO search.

140.    Further, during the June 5, 2024 investor conference call that occurred in connection with the Company's announcement of financial results for 1Q24, which took place post-market close (the "1Q24 Earnings Call"), defendant McDonald stated that he and Choe engaged "in regular conversations" during Choe's tenure as Lululemon's CPO.

141.    As one of Lululemon's most senior executive officers before and during the Class Period, and as a direct report to defendant McDonald, Choe was vested with significant responsibility at Lululemon, including determining the sizing and color purchases for Lululemon's inventory allocation and the related obligation to ensure that these purchases would be sufficient to meet expected future demand.

142.    In fact, according to a statement made by Lululemon's official Instagram account in late July 2023 in response to a customer comment about an out-of-stock U.S. women's product on the post regarding the 2023 back-to-school marketing campaign, the Company's "Design team" – meaning the team led by Choe – was responsible for "product restocks and new gear drops," and was being informed of customer feedback regarding out-of-stock U.S. women's products.

143.    As Defendants later admitted in FY24, in August 2023 Choe failed to purchase enough sizes 0 to 4 and color of U.S. women's products for Lululemon's inventory allocation to

meet the expected increased demand for those items that was facilitated by the 2023 back-to-school marketing campaign and related efforts to drive increased sales to younger U.S. women.

144.    For example, during the 1Q24 Earnings Call, defendant McDonald linked Lululemon's failure to have enough color in U.S. women's products to meet the expected demand from the Company's marketing campaign to Choe's FY23 inventory allocation failure, stating, in pertinent part, that "this was just a quarter where **the chosen color palette was more narrow** than I think the consumer coming into this year was looking for."

145.    In addition, shortly after the Class Period ended, during the August 29, 2024 investor conference call that occurred in connection with the Company's announcement of financial results for 2Q24 (the "2Q24 Earnings Call"), defendant McDonald admitted that Choe had failed to ensure that sufficient amounts of sizes 0 to 4 and color of U.S. women's products had been purchased by Lululemon to meet expected demand.  Specifically, defendant McDonald stated, in pertinent part, that "**the most significant factor**" contributing to Lululemon's insufficient inventory levels for sizes 0 to 4 and color in U.S. women's products during the Class Period was "**a product plan**" and "**product decisions**" made by Choe that did not include enough "**color, print, patterns, and silhouettes**" to meet the expected demand from younger U.S. women.

146.    Indeed, during the 2Q24 Earnings Call, defendant McDonald stated that Choe's failure to ensure the correct inventory allocation was "**directly linked**" to Lululemon's continued inability to provide enough sizes 0 to 4 and color of U.S. women's products in 2Q24.

147.    After Defendants made these statements on the 2Q24 Earnings Call, JP Morgan stated in an August 30, 2024 report on Lululemon that the "**lack of seasonal 'newness' in assortment is a decision made by the product/merchandising teams over a year ago (i.e. when Former Chief Product Officer Sun Choe still was within the organization)[.]**"  "Newness" refers

to new "color, print, patterns, and silhouette" for U.S. women's products, as confirmed by defendant McDonald during the 2Q24 Earnings Call.

148.    Likewise, *Dow Jones Institutional News Feed* reported on August 30, 2024, that "***[m]anagement clarified that the lack of 'newness' in assortment that weighed on performance in 2Q was a decision made by product and merchandising teams a year ago under a different reporting structure[.]***"

149.    Defendants provided additional context regarding Choe's August 2023 inventory allocation failure during the Company's October 10, 2024 analyst conference in Shanghai, China (the "October 2024 Conference").  Specifically, during the October 2024 Conference, defendant McDonald was asked by an analyst from Bank of America to explain why Lululemon has "been struggling in North America," to which he responded, in pertinent part, that "the North American team curated a tighter assortment" of "newness," *i.e.*, color, relative to expected demand.

150.    Defendant McDonald further responded to the Bank of America analyst during the October 2024 Conference by stating, in pertinent part, that "before under [the] CPO structure, I don't think the right conversations and challenging, conversations were happening . . . [with who was] making the merchandising curation decisions" and "under the old structure . . . it was fragmented, it wasn't an integrated team[.]"

151.    In addition, defendant McDonald admitted during the October 2024 Conference that Lululemon's failure to ensure the correct inventory allocation of sizes and colors in U.S. women's products in FY24 was the result of "***decisions we made***" versus any external factor, such as increased competition.

152.    Following the October 2024 Conference, JP Morgan stated in an October 14, 2024 report on Lululemon that Choe's FY23 inventory allocation failure meant that the "***[i]nitial Global***

*Design slate for 2024 [was] too narrow in the choice/SKU count driven by conservative planning (i.e., over-reliance on what had worked well in the assortment during the prior year)*" and "*[o]ver-curation from the Product Merchandising team resulted in material holes in the assortment with Chief Product Officer Sun Choe's departure announced on 5/21 (w/ role internally eliminated).*"

153. Likewise, during the December 2024 Interview, defendant McDonald again admitted that Lululemon's inventory allocation failure was caused by Choe, stating, in pertinent part, that this failure stemmed from "*decisions made around the merchandising mix. And the data's pointing to that, and it has all year*."

154. Accordingly, Defendants' admissions made in the 1Q24 Earnings Call, the 2Q24 Earnings Call, the October 2024 Conference, and the December 2024 Interview, demonstrate that Defendants knew, or recklessly disregarded, that the inventory allocation decision made by Choe in August 2023 did not contain sufficient sizing or color in U.S. women's products to align with the expected demand increase for those items facilitated by the Company's 2023 back-to-school marketing campaign.

**Defendants Knew, or Recklessly Disregarded, During the Class Period That Lululemon Lacked Sufficient Sizing and Color to Meet the Demand for U.S. Women's Products Created by the Company's 2023 Marketing Efforts to Younger U.S. Women**

155. By December 7, 2023, Defendants knew, or recklessly disregarded, that Lululemon did not have enough sizes 0 to 4 or color in U.S. women's products to meet the expected increased demand for these items facilitated by the Company's 2023 marketing campaign.

156. Instead of disclosing these material facts to investors, during the Class Period Defendants chose to materially misstate the status of Lululemon's then-current inventory allocation versus expected demand.

157.    For example, during the 3Q23 Earnings Call, which took place after market close on December 7, 2023, the day before the Class Period begins, Defendants told analysts and investors that Lululemon had a sufficient quality and quantity of inventory.

158.    Likewise, during the 3Q23 Earnings Call, Defendants stated that the 2023 back-to-school marketing campaign was successful and had contributed to market share gains.

159.    Because Lululemon's inventory management performance – especially for U.S. women's products – is so critical to the Company's financial results, as described above in ¶¶40-80, analysts and investors paid careful attention to Defendants' inventory and demand statements made during the 3Q23 Earnings Call.

160.    For example, Deutsche Bank stated in a December 8, 2023 report on Lululemon that "[m]anagement commented that they remain comfortable with both the 'quality' and 'quantity' of inventory."

161.    Likewise, Jefferies stated in a December 8, 2023 report on Lululemon that the Company had "solid control over inventory management."

162.    In addition, JP Morgan stated in a December 8, 2023 report on Lululemon that "mgmt stated 'we remain comfortable with both the quality and quantity of inventory at 4Q-end[.]'"

163.    Further, TD Cowen stated in a January 11, 2024 report on Lululemon that the Company's inventory had "a well positioned start into FY24."

164.    The analyst commentary following Defendants' statements made during the 3Q23 Earnings Call demonstrates that analysts and investors were materially misled into believing that Lululemon's inventory allocation was sufficient to meet demand when, in fact, it was not.

165.    The Individual Defendants were forced to admit this during the March 21, 2024 investor conference call – the very next earnings call following the 3Q23 Earnings Call – that occurred in connection with the Company's announcement of financial results for 4Q23 and FY23, which took place post-market close (the "4Q23 Earnings Call").

166.    Specifically, during the 4Q23 Earnings Call, the Individual Defendants admitted that the growth rate of Lululemon's U.S. business had materially slowed in 4Q23, and would continue to moderate in 1Q24, because Lululemon did not have sufficient inventory of sizes 0 to 4 and color of U.S. women's products to capture the increased demand facilitated by the 2023 back-to-school marketing campaign.

167.    Indeed, during the 4Q23 Earnings Call, defendant McDonald linked the 2023 back-to-school marketing campaign to Lululemon's inventory allocation failure for U.S. women's products, stating, in pertinent part, that "***[a]s we have attracted more younger guests into the brand, we have seen strong sell-through of our smaller sizes and our offering of color*** . . . our teams are chasing into these areas of the assortment so we can better maximize the business."

168.    By using the phrase "we have seen," Defendants admit that they were tracking in real-time the uptick in demand for smaller sizes and color in U.S. women's products as the Company saw increased purchases from younger U.S. customers as a result of the 2023 back-to-school marketing campaign.  As defendant Frank stated during the 2Q23 Earnings Call that "guests are responding well" to this marketing campaign as of August 2023, confirming that Defendants were seeing the increased demand in smaller sizes and color in U.S. women's products by at least this time.

169.    During the 4Q23 Earnings Call, an analyst from Robert W. Baird & Co. commented that "***this is the first time in a while, I think, I've heard you speak to stock-outs in certain sizes***

*and styles perhaps weighing on sales growth*," to which defendant Frank responded that there were "*a few pockets in the U.S. where we feel like we've got an opportunity to accelerate what's working in terms of inventory*," *i.e.*, smaller sizes and color for U.S. women's products.

170.    In response to the partial corrective disclosure made after the market closed on March 21, 2024, the price of Lululemon common stock declined $75.65 per share, or approximately 15.8%, from a close of $478.84 per share before the announcement on March 21, to close at $403.19 per share on March 22, 2024.

171.    In addition to the admissions made by Defendants on the 4Q23 Earnings Call, several other facts demonstrate that Defendants knew, or recklessly disregarded, that Lululemon's inventory allocation was materially deficient in sizes 0 to 4 and color for U.S. women's products as of the start of the Class Period, including: (1) the real-time access Defendants had to the Company's inventory levels by virtue of Lululemon's adoption of the Nedap System by January 2023; (2) the inherent nature of the 2023 back-to-school marketing campaign, *i.e.*, that younger U.S. women would naturally be demanding more sizes 0 to 4 and color in U.S. women's products in response to advertisements for those items; and (3) the inventory allocation failure by Choe, defendant McDonald's direct report, in August 2023 by not purchasing sufficient sizing or color in U.S. women's products to align with the expected demand from the Company's 2023 back-to-school marketing campaign.

172.    First, for the reasons discussed in ¶¶81-114 above, Lululemon's intentional shift to using the Nedap System in early 2023 meant that Defendants had the instant ability to know that Lululemon was running low on, and needed replenishment of, smaller sizes and colors of U.S. women's products.  As a result, Defendants had the ability by the start of the Class Period to easily ascertain that Lululemon lacked sufficient amounts of sizes 0 to 4 and color in U.S. women's

products.  Because Defendants repeatedly commented on the quality and quantity of Lululemon's inventory in the fiscal quarters leading into the start of the Class Period, this meant they were routinely and regularly monitoring the Company's inventory allocation before and during the Class Period, which would have, and should have, alerted them to Lululemon's inventory allocation failure before the 3Q23 Earnings Call.

173.    Indeed, as referenced in ¶113 above, Kerney confirmed that senior Lululemon management were apprised of the purchase and implementation of the Nedap System throughout the Company's operations by January 2023.

174.    Second, for the reasons discussed in ¶¶115-134 above, Lululemon's 2023 back-to-school marketing campaign meant Defendants understood before the 3Q23 Earnings Call that younger U.S. women were seeking sizes 0 to 4 and color in U.S. women's products from Lululemon in the second half of 2023 and first half of 2024.

175.    Indeed, the Individual Defendants' commentary on the 2Q23 and 3Q23 Earnings Calls, and at the September 2023 Conference, about the supposed success of the 2023 back-to-school marketing campaign, recited in ¶¶128-133 above, demonstrates their active participation in, and knowledge of, this marketing plan by the start of the Class Period.  Thus, by the start of the Class Period, the Individual Defendants knew, or recklessly disregarded, that Lululemon had experienced a material increase in expected demand for 4Q23 and FY24 in sizes 0 to 4 and color for U.S. women's products.

176.    Third, for the reasons discussed in ¶¶135-154 above, Choe's failure to ensure the correct inventory allocation for Lululemon in August 2023 in terms of smaller sizes and color for U.S. women's products, notwithstanding the expected increased demand from the 2023 back-to-school marketing campaign, meant that Defendants knew, or recklessly disregarded, that

Lululemon did not, in fact, have a sufficient quality or quantity of inventory as of the 3Q23 Earnings Call.

177.    As demonstrated by their pre-Class Period statements, as described in ¶¶68-80 above, Defendants were highly focused on, and frequently spoke about, Lululemon's inventory allocation in the fiscal quarters leading up to the Class Period.  These statements demonstrate that Defendants paid careful attention to the relative composition of Lululemon's inventory during each fiscal quarter, at the least.  As a result, Defendants knew, or recklessly disregarded, by the start of the Class Period that Choe's inventory allocation decision in August 2023 had left Lululemon materially deficient in sizes 0 to 4 and color in U.S. women's products.

178.    Notwithstanding the admissions made by Defendants during the 4Q23 Earnings Call, they continued to materially mislead analysts and investors during that call by stating that Lululemon's selection of smaller sizes and color in U.S. women's products would "continue to improve starting in Q2[.]"

179.    In reality, however, Choe's inventory allocation failure in August 2023 meant that the Company was unable to quickly replenish these sizes or colors.

180.    Investors learned this shortly after the 4Q23 Earnings Call when, on May 21, 2024, after the markets closed, Lululemon announced in a Form 8-K that Choe was departing the Company, that the Company was not replacing the CPO role, and that the Company was making strategic organizational changes to separate Lululemon's design and merchandising teams (the "May 2024 Form 8-K").

181.    In response to this partial corrective disclosure, the price of Lululemon common stock declined $23.35 per share, or approximately 7.2%, from a close of $322.98 per share before the announcement on May 21, to close at $299.63 per share on May 22, 2024.

182.    During the 2Q24 Earnings Call, on August 29, 2024, defendant McDonald confirmed that not replacing the CPO position and making the strategic organizational changes were in direct response to Choe's inventory allocation failure in August 2023.  Defendant McDonald stated, in pertinent part, that:

> And so also with this change, we're seeing a much tighter relationship in the brand/ marketing organization with merchandising, which is really the whole sell side of the business being under one leader where before it was a handoff, those conversations are happening much sooner and aligned in terms of where we see the opportunity aligning it to, what we're buying deep into and creating plans for that demand creation earlier in the process.

183.    Accordingly, during the Class Period, Defendants knew, or recklessly disregarded, that Lululemon did not have a sufficient quality or quantity of inventory to capitalize on the increased demand for U.S. women's products that Defendants purposely solicited through the 2023 back-to-school marketing campaign, and that Choe's inventory allocation failure ensured that Lululemon could not quickly replenish sizes 0 to 4 and color in U.S. women's products during the Class Period.

**Defendants Knew, or Recklessly Disregarded, That the Breezethrough Legging Would Not Materially Improve Lululemon's Revenue or Profit in FY24**

184.    During the 4Q23 Earnings Call, Defendants made additional false and misleading statements and omissions to investors in stating that the launch of a new leggings product would start to reverse the slowdown in the Company's U.S. business caused by Defendants' failure to ensure adequate sizes 0 to 4 and color in U.S. women's products to capture the increased demand facilitated by the 2023 back-to-school marketing campaign.

185.    Specifically, during the 4Q23 Earnings Call, analysts pressed Defendants to explain what will improve in Lululemon's U.S. business in FY24 as the Company was working to obtain adequate inventory of sizes 0 to 4 and color for U.S. women's products, with defendant McDonald

pointing to "*a hydrogen yarn legging coming out in summer [2024] . . . that we see playing a positive through the back half of this year*."

186.    During the 1Q24 Earnings Call, Defendants confirmed that the hydrogen yarn legging referenced on the 4Q23 Earnings Call was the Breezethrough legging.

187.    In other words, during the 4Q23 Earnings Call, Defendants sought to use future product launches, and the Breezethrough legging in particular, to prevent the financial harm caused by Defendants' size and color inventory allocation failure from causing a prolonged slowdown in the Company's U.S. business.

188.    Indeed, according to a Truist report on Lululemon dated March 22, 2024, "the company sees opportunities to improve in areas where in-stocks have been lacking (including new colors and sizes 0-4) [and] . . . we think the company's strong innovation pipeline will continue to be a key growth driver. *Management highlighted several new products coming out for women including hydrogen yarn leggings[.]*"

189.    During the 1Q24 Earnings Call, Defendants told investors that the Breezethrough legging would be the first new product of 2024, and that it would represent "significant innovation" in Lululemon's U.S. business.

190.    Analysts and investors believed that the Breezethrough legging launch needed to be successful to reverse the growth slowdown caused by Defendants' inventory allocation failure. For example, Evercore stated in a June 6, 2024 report on Lululemon that "LULU gave a more detailed explanation of some execution misses (unfavorable colors, out of stocks in key sizes[)] . . . *Importantly, the company is launching new technologies starting in 2Q (starting with Breeze Through pants for high temp low impact workouts this summer)[.]*"

191.    In fact, according to a BNP Paribas report on Lululemon dated August 1, 2024, the Breezethrough legging "*could be a $100m revenue business for 2H25*" representing a "*$0.50 EPS impact [for 2H25]*."

192.    According to a press release issued by Lululemon on Form 8-K on August 29, 2024, in connection with the 2Q24 Earnings Call, Lululemon's earnings per share ("EPS") for the first fiscal half of FY24 ("2H24") was $5.70.

193.    Thus, according to BNP Paribas, the market was anticipating that the Breezethrough legging would contribute approximately 8.8% to Lululemon's future earnings per share, a significant and material amount of profit.

194.    Indeed, according to a Wedbush report on Lululemon dated August 28, 2024 (the "August 2024 Wedbush Report"), the Breezethrough legging was modeled to account for approximately 5% of FY24 EPS, and approximately 9% of fiscal year 2025 EPS.

195.    On July 9, 2024, the Breezethrough legging launched in Lululemon's stores in the U.S. and online.

196.    The Breezethrough legging suffered from obvious design flaws that ensured these leggings would not achieve any amount of material revenue or profit growth for Lululemon, which Defendants failed to disclose during the 4Q23 Earnings Call or 1Q24 Earnings Call.

197.    According to a JP Morgan report on Lululemon dated July 25, 2024 (the "July 2024 JP Morgan Report"), there were three design flaws with the Breezethrough legging.

198.    First, the July 2024 JP Morgan Report described "a back seam in the shape of 'V' which customers cited as unflattering giving them a 'long butt' (see Figure 1)."

199.    Second, the July 2024 JP Morgan Report described "a front seam in the shape of a 'U' which customers also cited as unflattering across the stomach (see Figure 2)."

200. Third, the July 2024 JP Morgan Report described "a seam at the top of the waistband which some guests cited as digging into their skin/waist."

201. As confirmed by the July 2024 JP Morgan Report, Defendants knew, or recklessly disregarded, these obvious design flaws in the Breezethrough legging because they were readily apparent merely by viewing the seams on the leggings.

202. Defendants' repeated statements about the Breezethrough legging on the 4Q23 Earnings Call and 1Q24 Earnings Call demonstrate that they were knowledgeable about, and involved in, the launch of these leggings. In fact, Defendants pointed to the Breezethrough legging specifically as the first catalyst to supposedly reverse Lululemon's slowdown in U.S. growth, meaning this new leggings product launch had significant and material importance to the Company. Thus, Defendants necessarily would have, and should have, viewed the Breezethrough legging before speaking about it during the Class Period.

203. The obvious design flaws in the Breezethrough legging caused Lululemon to quickly pull them from the Company's U.S. stores and online on July 24, 2024, just two weeks after first launching them to supposedly reverse the slowdown in Lululemon's U.S. growth caused by Defendants' inventory allocation failure.

204. Analysts and investors first learned this through a *Bloomberg* report released after the market closed on July 24, 2024 (the "July 2024 Bloomberg Report"). According to the July 2024 Bloomberg Report, a Lululemon spokesperson told *Bloomberg* that "[w]e have made the decision to pause on sales for now to make any adjustments necessary to deliver the best possible product experience."

205.    In other words, the July 2024 Bloomberg Report informed investors that the Breezethrough legging was not a new product launch intended to drive material revenue and profit growth in FY24, but was instead a "test and learn" for a possible new product line.

206.    In response to this corrective disclosure made after the market closed on July 24, 2024, the price of Lululemon common stock declined $24.74 per share, or approximately 9.1%, from a close of $272.06 per share before the announcement on July 24, to close at $247.32 per share on July 25, 2024.

207.    According to *Bloomberg First Word*, the Company's closing stock price on July 25, 2024, was Lululemon's lowest closing stock price since May 2020, *i.e.*, during the height of the COVID-19 pandemic in the U.S.

208.    Analyst reaction to the Company pulling the Breezethrough legging was harsh, with the July 2024 JP Morgan Report stating that:

> ***Breezethrough represented the first of two innovations in the Women's leggings category mgmt expected to support improved revenue growth through 2H24 . . . Breezethrough compounds recent in-stock/color palette 'execution' concerns pushing out the reacceleration catalyst likely to 4Q/Holiday with our recent fieldwork pointing to no signs of near-term improvement through 2Q.  We are removing LULU from the Analyst Focus List[.]***

209.    As confirmed by the July 2024 JP Morgan Report, the immediate failure of the Breezethrough legging informed investors that Lululemon's revenue and profit growth from U.S. women's products would not improve in FY24.

210.    After pulling the Breezethrough legging less than three weeks after it was launched, Defendants confirmed that these leggings were never intended to "play[] a positive through the back half of this year."  Instead, defendant McDonald admitted during the 2Q24 Earnings Call, in pertinent part, that "[w]e view [the Breezethrough legging] as *a test and learn*."

211.    Likewise, defendant Frank stated during the 2Q24 Earnings Call that "Breeze Through really [had a] negligible impact*, a small test and learn and not a material financial impact*" and "[i]n terms of *Breeze Through is a very small test and learn. So, you know, an immaterial, negligible impact on both Q2 and then our guidance for the balance of the year. So nothing notable there*."

212.    In fact, during the 2Q24 Earnings Call, in response to an analyst question regarding "the time line for getting [the Breezethrough legging] back with some new – some new fits and silhouette," defendant McDonald confirmed that the Breezethrough legging was years away from being ready to launch as an actual new product line, stating that Lululemon was "working on being able to bring that back to market. *You won't see it in '24 on and not calling it for '25.*"  Thus, defendant McDonald confirmed during the 2Q24 Earnings Call that the Breezethrough legging would not contribute to Lululemon's revenue or profit during FY24.

213.    Defendants' admissions during the 2Q24 Earnings Call confirm that, at all relevant times, the Breezethrough legging was never intended to materially contribute to Lululemon's revenue or profit in FY24, *i.e.*, that these leggings never was supposed to "play[] a positive through the back half of this year[,]" because these leggings were always supposed to be a "test and learn."

214.    Further, Defendants' admissions during the 2Q24 Earnings Call confirm that the Breezethrough legging was rushed to the market with obvious design flaws in the seams, meaning these leggings had not been designed to be a successful new product launch in FY24.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

215.    During the Class Period, Defendants made materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning:

(1) Lululemon's inventory allocation and related expected demand from the 2023 marketing campaign; and (2) the Breezethrough legging.

**The Materially False and Misleading Inventory Allocation Misstatements and Omissions**

216.     The Class Period begins on December 8, 2023.  On the prior day, after the market closed, Defendants held the 3Q23 Earnings Call to discuss Lululemon's financial results for 3Q23. During the 3Q23 Earnings Call, defendant Frank stated, in pertinent part, that "*[w]e remain comfortable with both the quality and quantity of our inventory*."

217.     The statement by defendants Lululemon and Frank in ¶216 was materially false and misleading when made because Lululemon lacked sufficient quantities of sizes 0 to 4 or color for U.S. women's products to capture the increased demand from younger U.S. customers that Defendants purposely solicited with the 2023 back-to-school advertising campaign.  Because Lululemon failed in August 2023 to ensure an adequate quantity of U.S. women's products in terms of sizes 0 to 4 and color, the Company had, and would continue to, miss significant sales opportunities for U.S. women's products as those smaller sizes and colors ran out.

218.     During the 3Q23 Earnings Call, defendant Frank also stated, in pertinent part, that "*we feel pleased with the level and currency of the inventory, both at the end of Q3 and then at the end of Q4 as well*."

219.     The statement by defendants Frank and Lululemon in ¶218 was materially false and misleading for the reasons set forth in ¶217 above.

220.     During the 3Q23 Earnings Call, defendant McDonald stated, in pertinent part, that "*[t]he quarter began strong as guests responded well to our back-to-school product innovations and our strategies to connect with younger guests through dedicated digital marketing and targeted activations and our market share gains continued*."

- 43 -

221.    The statement by defendants Lululemon and McDonald in ¶220 was materially false and misleading when made because it created a materially false impression that Lululemon's market share gains from the 2023 back-to-school advertising campaign were sustainable.  In reality, Lululemon was incapable of satisfying the increased demand for U.S. women's products in sizes 0 to 4 and color that was facilitated by the 2023 back-to-school advertising campaign because of Lululemon's inventory allocation failure in August 2023.  Once Defendants chose to use the 3Q23 Earnings Call to speak about the connection between the 2023 back-to-school advertising campaign and Lululemon's increased market share, they had a duty to speak completely and truthfully, including about the unsustainability of those market share gains due to the Company's materially deficient inventory allocation for U.S. women's products.

222.    During the 3Q23 Earnings Call, defendant McDonald also stated, in pertinent part, that "*[w]e have not seen a dramatic shift as it relates to our product and our assortment . . . [we're] not seeing a behavioral shift within our assortment mix with our guests*."

223.    The statements by defendants Lululemon and McDonald in ¶222 were materially false and misleading when made because Lululemon had, in fact, experienced a behavioral shift in the Company's assortment mix, *i.e.*, significantly increased demand for sizes 0 to 4 and color in U.S. women's products that Defendants purposely solicited with the 2023 back-to-school advertising campaign.  As a result, Defendants' statements misled analysts and investors into falsely believing that Lululemon's assortment mix had not materially changed as of the 3Q23 Earnings Call when, in fact, it had.

224.    Also post-market close on December 7, 2023, Lululemon filed the 3Q23 Form 10-Q, which stated, in pertinent part, as follows:

> To ensure adequate inventory supply, we must forecast inventory needs and place orders with our manufacturers based on our estimates of future demand for

particular products.  Our ability to accurately forecast demand for our products could be affected by many factors, including an increase or decrease in guest demand for our products or for products of our competitors, our failure to accurately forecast guest acceptance of new products, product introductions by competitors, unanticipated changes in general market conditions (for example, because of global economic concerns such as inflation, an economic downturn, or delays and disruptions resulting from local and international shipping delays and labor shortages), and weakening of economic conditions or consumer confidence in future economic conditions (for example, because of inflationary pressures, or because of sanctions, restrictions, and other responses related to geopolitical events).  ***If we fail to accurately forecast guest demand, we may experience excess inventory levels or a shortage of products available for sale in our stores or for delivery to guests.***

Inventory levels in excess of guest demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margin to suffer and could impair the strength and exclusivity of our brand.  Conversely, ***if we underestimate guest demand for our products, our manufacturers may not be able to deliver products to meet our requirements, and this could result in damage to our reputation and guest relationships.***

225.    The statements by Defendants in ¶224 that "[i]f we fail to accurately forecast guest demand, we may experience . . . a shortage of products available for sale" and "if we underestimate guest demand for our products . . . this could result in damage to our reputation and guest relationships" were materially false and misleading when made because Lululemon then-currently lacked sufficient quantities of sizes 0 to 4 or color for U.S. women's products to capture the increased demand from younger U.S. customers that Defendants purposely solicited with the 2023 back-to-school advertising campaign.  Thus, instead of accurately describing the present risks to Lululemon posed by the Company's failure to ensure the correct inventory allocation of U.S. women's products, Defendants chose to recycle hypothetical risk disclosures that were no longer hypothetical, and in fact had materialized, as of the filing of the 3Q23 Form 10-Q.  As a result, Defendants' statements misled analysts and investors into falsely believing that Lululemon's inventory of U.S. women's products was sufficient to meet customer demand when, in fact, the Company had a material inventory deficiency of sizes 0 to 4 and color in these products.

226.    On January 8, 2024, Lululemon issued a Form 8-K, which was signed by defendant

Frank and attached a press release that provided updated revenue and earnings guidance for 4Q23

(the "January 2024 Form 8-K").    In the January 2024 Form 8-K, defendant Frank stated, in

pertinent part, that:

> We are pleased with our performance during the holiday season, ***as guests continue
> to respond well to our innovative and versatile product offerings.  Our sales trend
> remains balanced across channels, categories, and geographies***, enabling us to
> raise our guidance for [4Q23] and close out another strong year.

227.    The statements by defendants Lululemon and Frank in ¶226 were materially false

and misleading when made because they created a materially false impression that Lululemon's

recent performance in U.S. women's product was sustainable or improving.    In reality, due to

Defendants' failure by December 2023 to ensure an adequate quantity of U.S. women's products

inventory in terms of sizes 0 to 4 and color, the Company was poised to miss significant sales

opportunities for U.S. women's products once those sizes and colors ran out, which would

negatively impact Lululemon's future revenue and profit.    In fact, by the time that the January

2024 Form 8-K was filed, Lululemon's inventory was already depleted without replenishment due

to Lululemon's inventory allocation failure in August 2023, meaning that there were not enough

"product offerings" to meet Lululemon's expected demand for U.S. women's products.

228.    During the 4Q23 Earnings Call, defendant McDonald stated, in pertinent part, that:

> As we obviously mentioned that we're chasing color and size. And we expect that,
> ***that will continue to improve starting in Q2*** through [Q4]. In fact, we're seeing --
> and as color hits now, the guests respond incredibly well to it.

229.    The statement by defendants Lululemon and McDonald in ¶228 that Lululemon's

inventory of sizes 0 to 4 and color for U.S. women's products "will continue to improve starting

in Q2" was materially false and misleading when made because Lululemon's depleted inventory

of sizes 0 to 4 and color in U.S. women's products could not quickly improve due to Choe's failure to purchase enough of this inventory in August 2023.

230.    Also on March 21, 2024, Lululemon filed the 2023 Form 10-K, which stated, in pertinent part, that:

> To ensure adequate inventory supply, we must forecast inventory needs and place orders with our manufacturers based on our estimates of future demand for particular products. Our ability to accurately forecast demand for our products could be affected by many factors, including an increase or decrease in guest demand for our products or for products of our competitors, our failure to accurately forecast guest acceptance of new products, product introductions by competitors, unanticipated changes in general market conditions (for example, because of global economic concerns such as inflation, an economic downturn, or delays and disruptions resulting from local and international shipping delays and labor shortages), and weakening of economic conditions or consumer confidence in future economic conditions (for example, because of inflationary pressures, or because of sanctions, restrictions, and other responses related to geopolitical events). If we fail to accurately forecast guest demand, we may experience excess inventory levels or a shortage of products available for sale in our stores or for delivery to guests.

> Inventory levels in excess of guest demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margin to suffer and could impair the strength and exclusivity of our brand. Conversely, ***if we underestimate guest demand for our products, our manufacturers may not be able to deliver products to meet our requirements, and this could result in damage to our reputation and guest relationships.***

231.    The statement by Defendants in ¶230 that "if we underestimate guest demand for our products, our manufacturers may not be able to deliver products to meet our requirements" was materially false and misleading when made because Lululemon could not quickly resolve the Company's failure to purchase sufficient quantities of sizes 0 to 4 or color for U.S. women's products due to Choe's inventory allocation failure in August 2023.  Thus, instead of accurately describing the present risk to Lululemon posed by the Company's failure to ensure the correct inventory allocation of U.S. women's products, Defendants chose to recycle a hypothetical risk

disclosure that was no longer hypothetical, and in fact had materialized, as of the filing of the 2023 Form 10-K.

**The Materially False and Misleading Breezethrough Legging Misstatements and Omissions**

232.    On March 21, 2024, during the 4Q23 Earnings Call, defendant McDonald stated, in pertinent part, that "*[w]e have a hydrogen yarn legging coming out in summer for yoga . . . that we see playing a positive through the back half of this year*."

233.    The statements by defendants Lululemon and McDonald in ¶232 were materially false and misleading when made because the Breezethrough legging suffered from obvious design flaws and was never intended to be a new product launch in FY24, meaning these leggings had no chance of reversing the U.S. growth slowdown in FY24 caused by Lululemon's inventory allocation failure in U.S. women's products.  Thus, instead of "playing a positive through the back half of this year[,]" the launch of the Breezethrough legging was merely a "test and learn" effort that never had a chance of materially increasing Lululemon's revenue and profit in FY24.

234.    In the 2023 Form 10-K, also filed on March 21, 2024, Defendants stated, in pertinent part, that "*[i]f we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability*."

235.    The statement by Defendants in ¶234 was materially false and misleading when made because the Breezethrough legging had obvious design flaws that made it unappealing to Lululemon's customers and was only intended to be a "test and learn," not a full new product launch, meaning Lululemon had, in fact, failed to anticipate customer preferences.  Thus, the launch of the Breezethrough legging could not materially increase the Company's revenue or profit in FY24.  As a result, instead of accurately describing the present risk to Lululemon posed by the Company's failure to anticipate consumer preferences, Defendants chose to recycle a hypothetical

risk disclosure that was no longer hypothetical, and in fact had materialized, as of the filing of the

2023 Form 10-K.

236.    On June 5, 2024, during the 1Q24 Earnings Call, defendant McDonald stated, in

pertinent part, that:

> Looking forward, we're on track to bring significant innovation into our assortments beginning the end of Q2 and into the second half of the year.  Within women's, we have some exciting new launches planned within our leggings assortment.  ***These include a new innovation design for hot, low impact workouts and made from a new performance fabric, one of our quickest drying and lightest weight to date*** . . .  The upcoming newness in leggings is a perfect example of how we continue to bring ***innovation*** into our core categories, where we already have significant strength.  Our teams continue to expand our product offerings with new technical solutions, and I'm excited for you to see these new styles.
>
> *        *        *
>
> ***We have some exciting new innovation coming in our leggings, in particular in the next few weeks.  Early July, we'll be launching a new innovation in leggings with a hydrogen yar[n] called [Breezethrough]***.

237.    The statements by defendants Lululemon and McDonald in ¶236 about the

"launch" and "innovation" of the Breezethrough legging were materially false and misleading

when made because they created a materially false impression that the Breezethrough legging was

intended to be a new launch of a key U.S. women's product.  In reality, the Breezethrough legging

suffered from obvious design flaws and was never intended to be a new product launch in July

2024 and, therefore, was inherently incapable of reversing the U.S. growth slowdown in FY24

caused by Lululemon's inventory allocation failure in U.S. women's products.  Once Defendants

chose to use the 1Q24 Earnings Call to speak about the "launch" and "innovation" that the

Breezethrough legging supposedly demonstrated, they had a duty to speak completely and

truthfully, including about the obvious design flaws plaguing the Breezethrough legging and the

"test and learn" nature of these leggings, which ensured that the Breezethrough legging would not

materially increase the Company's revenue or profit in FY24.

238.     In the Form 10-Q for the fiscal quarter ended April 28, 2024 ("1Q24"), which was filed with the SEC after the market closed on June 5, 2024, and signed and/or certified by defendants McDonald and Frank (the "1Q24 Form 10-Q"), Defendants stated, in pertinent part, that "*[i]f we are unable to anticipate consumer preferences and successfully develop and introduce new, innovative, and differentiated products, we may not be able to maintain or increase our sales and profitability*."

239.     The statement referenced above in ¶238 was materially false and misleading for the reasons set forth in ¶235.

### ADDITIONAL SCIENTER ALLEGATIONS

240.     Defendants were motivated to engage in the alleged fraudulent course of conduct in order to allow senior Lululemon officers and directors, including the Individual Defendants, to make open market sales of their personally-held Lululemon common stock at artificially inflated prices, which yielded them gross proceeds of over $21 million during the Class Period, as follows:

| Name | Title | Date | No. of Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Defendant McDonald | CEO and Director | 18-Dec-2023 | 12,500 | $500.00 | $6,250,000 |
| | | 18-Dec-2023 | 12,500 | $495.00 | $6,187,500 |
| | | | **25,000** | | **$12,437,500** |
| Defendant Frank | CFO | 18-Dec-2023 | **1,553** | $500.00 | **$776,500** |
| Celeste Burgoyne | President, Americas | 14-Dec-2023 | 5,400 | $495.76 | $2,677,104 |
| | | 14-Dec-2023 | 10,000 | $494.03 | $4,940,300 |
| | | | **15,400** | | **$7,617,404** |
| Nicole Neuburger | Chief Brand Officer | 18-Dec-2023 | **705** | $500.00 | **$352,500** |
| **TOTAL** | | | **42,658** | | **$21,183,904** |

241.     The open market sales of Lululemon common stock sold by the Individual Defendants, Burgoyne (Lululemon's President of the Americas), and Neuburger (Lululemon's Chief Brand Officer) listed in the chart in ¶240 were mostly realized as net profits by these

individuals, as follows: (1) defendant McDonald realized net profits of $9,020,750; (2) defendant Frank realized net profits of $694,620; (3) Burgoyne realized net profits of $5,942,004; and (4) Neuburger realized net profits of $352,500.

242.    Collectively, these Lululemon insiders realized over $16 million worth of net profits from their suspiciously timed mid-December 2023 open market sales of Lululemon common stock.

243.    The shares sold by the Individual Defendants, Burgoyne, and Neuburger listed in the chart in ¶240, and whose net profits are detailed in ¶241, were the only open market sales of Lululemon securities made by these, or any other, Company insiders during the Class Period.

244.    The open market sales made by the Individual Defendants, Burgoyne, and Neuburger listed in the chart in ¶240, and whose net profits are detailed in ¶241, were highly unusual in amount based on: (1) the significant dollar value of the net profits realized by the Individual Defendants, Burgoyne, and Neuburger; and (2) the sizeable percentages that each of the Individual Defendants, Burgoyne, and Neuburger sold of their Lululemon common stock holdings as of December 2023.

245.    The open market sales made by the Individual Defendants, Burgoyne, and Neuburger listed in the chart in ¶240, and whose net profits are detailed in ¶241, were highly unusual in timing because they were made: (1) eleven days after Defendants' initial false and misleading statements to investors about Lululemon's inventory allocation and related market share gains from the 2023 back-to-school marketing campaign; (2) months before the first partial corrective disclosure made by Defendants regarding Lululemon's inventory allocation failure and the related negative impact to the Company's financial performance and stock price; and (3) near the all-time high for the Company's common stock price of $511.29 per share, which occurred at

market close on December 29, 2023.  Indeed, when these open market sales were made on December 14 and 18, 2023, they came shortly after Lululemon's common stock had closed at its then-record price of $504.50 on December 13, 2023, only the third time in the Company's history to that point that Lululemon's common stock had a closing price in excess of $500.00.

246.    Rule 10b5-1 is an SEC regulation that allows insiders of public companies, like the Individual Defendants, to create a trading plan for selling their stock at a pre-determined time for a pre-determined number of shares.  The purpose of a Rule 10b5-1 trading plan for corporate executives is to avoid accusations of insider trading in the stock of the companies where they are insiders.  By making public sales of stock outside of a Rule 10b5-1 trading plan, corporate insiders cannot rely on the protection afforded by Rule 10b5-1.

247.    According to the Form 4 filed by defendant McDonald on December 20, 2023 (the "McDonald Form 4"), defendant McDonald's two open market sales on December 18, 2023 were not made pursuant to a Rule 10b5-1 trading plan.  Thus, defendant McDonald purposely chose to not make these open market sales pursuant to a Rule 10b5-1 trading plan.

248.    According to the McDonald Form 4, defendant McDonald's sale of 25,000 shares of Lululemon common stock accounted for 25.3% of his Lululemon security beneficial holdings as of the date that the McDonald Form 4 was filed.

249.    In the two year period before the Class Period, beginning on December 8, 2021, defendant McDonald made no open market sales of Lululemon common stock.  Thus, the sales listed in the McDonald Form 4 represent defendant McDonald's only open market sales of Lululemon common stock for the period of December 8, 2021 to July 24, 2024, further demonstrating the unusual nature of these sales.

250.    According to the Form 4 filed by defendant Frank on December 20, 2023 (the "Frank Form 4"), defendant Frank's one sale on December 18, 2023 was not made pursuant to a Rule 10b5-1 trading plan.  Thus, defendant Frank purposely chose to not make this sale pursuant to a Rule 10b5-1 trading plan.

251.    According to the Frank Form 4, defendant Frank's sale of 1,553 shares of Lululemon common stock accounted for 15.6% of her Lululemon security beneficial holdings as of the date that the Frank Form 4 was filed.

252.    In the two year period before the Class Period, beginning on December 8, 2021, defendant Frank made no open market sales of Lululemon common stock.  Thus, the sale listed in the Frank Form 4 represents defendant Frank's only open market sale of Lululemon common stock for the period of December 8, 2021 to July 24, 2024, further demonstrating the unusual nature of this sale.

253.    According to the Form 4 filed by Burgoyne on December 18, 2023 (the "Burgoyne Form 4"), Burgoyne's two sales on December 14, 2023 were not made pursuant to a Rule 10b5-1 trading plan.  Thus, Burgoyne purposely chose to not make these sales pursuant to a Rule 10b5-1 trading plan.

254.    According to the Burgoyne Form 4, Burgoyne's sale of 15,400 shares of Lululemon common stock accounted for 60.9% of her Lululemon security beneficial holdings as of the date that the Burgoyne Form 4 was filed.

255.    In the two year period before the Class Period, beginning on December 8, 2021, Burgoyne made only one other open market sale of Lululemon common stock, on March 31, 2023, for a net profit of approximately $4.1 million.  Thus, the sale listed in the Burgoyne Form 4

represents Burgoyne's second open market sale of Lululemon common stock for the period of December 8, 2021 to July 24, 2024, further demonstrating the unusual nature of this sale.

256.    According to the Form 4 filed by Neuburger on December 20, 2023 (the "Neuburger Form 4"), Neuburger's one sale on December 18, 2023 was not made pursuant to a Rule 10b5-1 trading plan.  Thus, Neuburger purposely chose not to make this sale pursuant to a Rule 10b5-1 trading plan.

257.    According to the Neuburger Form 4, Neuburger's sale of 705 shares of Lululemon common stock accounted for 14.9% of her Lululemon security beneficial holdings as of the date that the Neuburger Form 4 was filed.

258.    In the two year period before the Class Period, beginning on December 8, 2021, Neuburger made no open market sales of Lululemon common stock.  Thus, the sale listed in the Frank Form 4 represents Neuburger's only open market sale of Lululemon common stock for the period of December 8, 2021 to July 24, 2024, further demonstrating the unusual nature of this sale.

259.    According to the 2024 Form DEF14A, the Individual Defendants, Burgoyne, and Neuburger were four of Lululemon's six executive officers during the Class Period.

260.    Because a majority of Lululemon's executive officers sold large percentages of their Lululemon common stock holdings during the Class Period for unusually large net profits, and at similar times – within one week of each other, and just after Defendants' false and misleading statements during the 3Q23 Earnings Call and Lululemon's common stock price closed above $500 for the first time – these open market sales collectively support a strong inference of scienter against the Individual Defendants.

261.    Accordingly, the Individual Defendants were motivated to make materially false and misleading statements and conceal materially adverse information from investors regarding

Lululemon's inventory allocation so that they could personally profit from the artificial inflation in the trading price of Lululemon common stock – which was trading at a then-record high in mid-December 2023 – resulting from their materially false and misleading statements and omissions during the Class Period.

262.    Furthermore, as alleged herein, Lululemon and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

263.    As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Lululemon, their control over, and/or receipt and/or modification of Lululemon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lululemon, participated in the fraudulent scheme alleged herein.

264.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

265.    The Individual Defendants were each executive officers of Lululemon during the Class Period.  Based on their roles at Lululemon, each of the Individual Defendants would have

been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on Lululemon's key market, U.S. women's products.

266.    At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Lululemon, Defendants knew, or recklessly disregarded, the extent and scope of their statements during the Class Period.

267.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

268.    In addition, Defendants' admissions during the 4Q23 Earnings Call that Lululemon did not have enough sizes 0 to 4 or color in U.S. women's products to meet the demand for those products created by the 2023 back-to-school marketing campaign establish that Defendants knew, or should have known, before the 3Q23 Earnings Call, that Lululemon's inventory allocation lacked sufficient amounts of these sizes and colors of U.S. women's products.

269.    Similarly, Lululemon's adoption of the Nedap System meant that Defendants had instant access to Lululemon's current inventory allocation at any point before or during the Class

Period. Thus, Defendants knew, or should have known, that Lululemon did not have sufficient quantities of sizes 0 to 4 and color in U.S. women's products at all relevant times.

270. Further, Lululemon's 2023 back-to-school marketing campaign placed Defendants on notice that the Company was purposely soliciting younger U.S. customers to seek smaller sizes and color in U.S. women's products. Thus, Defendants knew, or should have known, that ensuring adequate quantities of these U.S. women's products was necessary for Lululemon to capitalize on the expected increased demand facilitated by the 2023 back-to-school marketing campaign.

271. Also, because Choe reported directly to McDonald and was an executive officer of the Company, and the Individual Defendants repeatedly spoke about the quantity and composition of Lululemon's inventory allocation before the Class Period, Defendants knew, or should have known, that Choe failed to ensure the purchase of enough sizing and color of U.S. women's products in August 2023 to match the expected increased demand facilitated by the 2023 back-to-school marketing campaign.

272. Likewise, the obvious design flaws with the Breezethrough legging required minimal effort to ascertain, as explained in the July 2024 JP Morgan Report. Because Defendants repeatedly stated that these leggings were critical to reversing Lululemon's slowdown in U.S. growth, and positively described the "innovation" used to design them, Defendants knew, or should have known, about the obvious design flaws plaguing the Breezethrough legging at all relevant times.

273. Moreover, Defendants' admissions during the 2Q24 Earnings Call that the Breezethrough legging was always intended to be a "test and learn," and would not be launched as a full product line until 2025 at the earliest, demonstrate that Defendants knew, or recklessly

disregarded, at all relevant times that the Breezethrough legging was incapable of materially increasing Lululemon's revenue or profit in FY24.

274.    The allegations above also establish a strong inference that Lululemon, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Lululemon's true operating condition and present and expected financial performance from investors.  By concealing these material facts from investors, Lululemon maintained and/or increased its artificially inflated common stock price throughout the Class Period.

275.    As executives of Lululemon, the Individual Defendants are both candidates for imputing corporate scienter to Lululemon.

276.    In addition, as executives and/or senior managers of Lululemon, Choe, Barker and Kerney are also candidates for imputing corporate scienter to Lululemon.

### LOSS CAUSATION/ECONOMIC LOSS

277.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lululemon's common stock and/or options on Lululemon's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock and/or options on Lululemon's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Lululemon's common stock and/or options on Lululemon's common stock fell precipitously as the artificial inflation was removed.

278.    As a result of their purchases of Lululemon common stock and/or options on Lululemon common stock during the Class Period, Lead Plaintiffs and the other Common Stock Class and Options Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused the Company's common stock and/or options on the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $511.29 per share at market close on December 29, 2023, the highest closing price ever achieved by the Company since Lululemon went public in July 2007.

279.    On March 21, 2024, after the close of trading, Lululemon announced the Company's financial results for 4Q23 and FY23, disclosing for the first time that Lululemon's failure to ensure adequate inventory of sizes 0 to 4 and color for U.S. women's products had negatively impacted, and would continue to negatively impact, the Company's U.S. growth.

280.    In response to this revelation, the price of Lululemon common stock declined $75.65 per share, or approximately 15.8%, from a close of $478.84 per share before the announcement on March 21, 2024, to close at $403.19 per share on March 22.

281.    Analysts linked Lululemon's stock decline following the 4Q23 Earnings Call to the Company's inventory allocation failure for U.S. women's products.

282.    For example, Wedbush stated in a March 21, 2024 report on Lululemon that "North America growth slowed to +9% in Q4 . . . vs. +12.5% in Q3 . . . ***conversion has declined due to assortment-based issues with sizing and colors***."

283.    Likewise, Evercore stated in a March 22, 2024 report on Lululemon that "LULU offered some commentary around not having enough supply in sizes 0-4 and popular colors (a transitory execution error stemming from LULU's strategy to recruit college/teen customers)."

284.    In addition, Morgan Stanley stated in a March 22, 2024 report on Lululemon that "*[Lululemon] did not have enough smaller sizes & specific colorways to meet younger-consumer demand recently.*"

285.    Further, on March 22, 2024, *Bloomberg News* reported that "**Lululemon Sinks 15% on Slower US Store Traffic**, Weaker Outlook[,]" and further reported that the decline following the 4Q23 Earnings Call was the Company's "**biggest decline since March 2020.**"

286.    Also, the April 2024 JP Morgan Report stated that "management cited sales have been left on the table w/ product out-of-stocks in smaller sizes (notably sizes 0 to 4) and across key colors, noting an opportunity to better maximize sales with the younger guest (i.e. college age demographic) . . . ***Worth noting on LULU's younger guest: Management cited an intentional and successful strategy to introduce younger guests to the brand through marketing & community activations during 2023[.]***"

287.    On May 21, 2024, after the close of trading, Lululemon announced in the May 2024 Form 8-K that Choe had departed the Company on May 15, 2024, that the CPO role was not being replaced, and that Lululemon was implementing a more integrated organizational structure.

288.    In response to this revelation, the price of Lululemon common stock declined $23.35 per share, or approximately 7.2%, from a close of $322.98 per share before the announcement on May 21, 2024, to close at $299.63 per share on May 22.

289.    Analysts interpreted Lululemon's stock decline following the May 2024 Form 8-K to mean that the Company's inventory allocation failure would not be easily or quickly remediated.

290.    For example, Barclays stated in a May 21, 2024 report on Lululemon that "***[Choe's] departure may signal that a quick fix in size or color to LULU's current assortment may take longer to course-correct than initially thought***."

291.    In addition, on May 22, 2024, *Barron's* reported that "Choe's resignation appeared to take Wall Street by surprise, ***raising concerns for some analysts about Lululemon's product assortment and path for revenue growth***."

292.    Likewise, on May 24, 2024, *Bloomberg News* reported that:

> John Zolidis, founder of consumer-focused investment adviser Quo Vadis Capital, also removed his long recommendation on Lululemon shares this week.  He noted that Choe's departure follows concerning commentary from the company on its March earnings call, where it blamed both squeezed shoppers and the wrong product assortment for a softer start to its fiscal year.  ***"It's very troubling," he said. "It sounds like something is very wrong with the merchandizing or the execution."***

293.    *Bloomberg News* further reported on May 24, 2024 that "[s]hares slumped 9.5% this week, driven by news that [CPO Choe] is leaving the company and its merchandising and branding teams will be reorganized.  The stock has now declined 41% this year and is the worst performer in the S&P 500 Index so far in 2024."

294.    On July 24, 2024, after the close of trading, Lululemon announced in the July 2024 Bloomberg Report that the Company had pulled the Breezethrough legging from all U.S. stores and online after receiving significant customer backlash.

295.    In response to this revelation, the price of Lululemon common stock declined $24.74 per share, or approximately 9.1%, from a close of $272.06 per share before the announcement on July 24, 2024, to close at $247.32 per share on July 25.

296.    Analysts linked Lululemon's stock decline following the July 2024 Bloomberg Report to the Company's decision to pull the Breezethrough legging and the related negative impact on revenue and profit that decision was expected to have on Lululemon's FY24 financial performance.

297.    For example, according to the August 2024 Wedbush Report, "LULU has hit unexpected turbulence in 2024, which was exacerbated by last month's product-quality issues with their new 'Breeze Through' leggings line."

298.    In addition, BNP Paribas stated in an August 30, 2024 report on Lululemon that "*[i]t is our understanding from investors who met with mgmt. that there was excitement for Breezethrough to drive the 2H[24] reacceleration*."

299.    According to *Bloomberg First Word*, Lululemon's closing stock price of $247.32 on July 25, 2024, was the Company's lowest closing stock price since May 2020.

300.    Indeed, the below chart of Lululemon's common stock price trading during the Class Period demonstrates the extent of Defendants' fraud and the related damage to Lead Plaintiffs, the Common Stock Class, and the Options Class:



301.    As shown above, the timing and magnitude of the price declines in Lululemon's common stock negate any inference that the losses suffered by Lead Plaintiffs, the Common Stock Class, and the Options Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## CLASS ACTION ALLEGATIONS

302.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of two putative classes: (1) the "Common Stock Class," consisting of all purchasers of the common stock of Lululemon during the Class Period, inclusive, and who were damaged thereby; and (2) the "Options Class," consisting of all purchasers of options on Lululemon common stock during the Class Period, inclusive, and who were damaged thereby.  Excluded from the Common Stock Class and the Options Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

303.    The members of each Class are so numerous that joinder of all members is impracticable.  According to the 3Q23 Form 10-Q, Lululemon had over 121 million shares of common stock outstanding by the start of the Class Period, and those shares were actively traded on the NASDAQ throughout the Class Period.  While the exact number of Common Stock Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the Common Stock Class.  Record owners and other members of the Common Stock Class may be readily identified from, *inter alia*, records maintained by Lululemon and its transfer agent, and may be notified of the pendency of this action by mail using forms of notice customarily used in securities class actions.  Similarly, while the exact number of Options Class members is unknown

to the Trust at this time, the Trust believes that there are hundreds (if not thousands) of members of the proposed Options Class. Record owners and other members of the Options Class may be identified from records maintained by third parties that transacted in options with Options Class members and exchanges where options on Lululemon common stock are regularly traded.

304.    Lead Plaintiffs' claims are typical of the claims of the members of the Common Stock Class, and the Trust's claims are typical of those of the Options Class, as all members of each respective Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

305.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Common Stock Class, and the Trust will fairly and adequately protect the interests of the members of the Options Class, and Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

306.    Common questions of law and fact exist as to all members of each respective Class and predominate over any questions solely affecting individual members of each respective Class. Among the questions of law and fact common to each Class are:

(a)    whether statements made by Defendants misrepresented material facts about the business, operations, and management of Lululemon;

(b)    whether Defendants failed to disclose material facts in discussing the business, operations, and management of Lululemon, making those statements materially false and misleading;

(c)    whether the federal securities laws were violated by Defendants' acts or omissions as alleged herein;

(d)    whether the price of Lululemon common stock, and the price of options on Lululemon common stock, were artificially inflated during the Class Period; and

(e)    to what extent the members of each respective Class have sustained damages and the proper measure of damages.

307.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Common Stock Class and the Options Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<b>NO SAFE HARBOR</b>

308.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements challenged herein.  Many of the statements challenged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS

309.     Lead Plaintiffs on behalf of the Common Stock Class, and the Trust on behalf of the Options Class, will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

310.     With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a)     Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b)     the misrepresentations and omissions were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Lead Plaintiffs and other members of the Common Stock Class purchased Lululemon common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts, and the Trust and other members of the Options Class purchased or sold options on Lululemon common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

311.     At all relevant times, the market for Lululemon common stock was efficient for the following reasons, among others:

(a)     Lululemon common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Lululemon filed periodic public reports with the SEC and the NASDAQ;

(c)     Lululemon regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Lululemon was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

312.    Because options are contracts to buy or sell a certain number of shares of common stock at a predetermined price within a specific timeframe, options necessarily derive their value from the underlying common stock price.  Thus, the market for options on Lululemon common stock was efficient at all relevant times for the same reasons articulated above in ¶311 for the market for Lululemon common stock.

313.    As a result of the foregoing, the market for Lululemon common stock and the market for options on Lululemon common stock promptly digested current information regarding Lululemon from all publicly available sources and reflected such information in the price of the stock or option.  Under these circumstances, all purchasers of Lululemon common stock, and all purchasers of options on Lululemon common stock, during the Class Period suffered similar injury

through their purchase of Lululemon common stock and/or purchase of options on Lululemon common stock at artificially inflated prices, and a presumption of reliance applies.

314.    In addition to the *Basic* presumption, a presumption of reliance for the Common Stock Class and the Options Class is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims in each respective Class are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Lululemon's central business operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

315.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

316.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

317.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of Lululemon common stock, and the purchasers of options on Lululemon common stock, during the Class Period.

318.    Lead Plaintiffs and the Common Stock Class, and the Trust and the Options Class, have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lululemon common stock and/or options on Lululemon common stock.  Lead Plaintiffs and the Common Stock Class, and the Trust and the Options Class, would not have purchased Lululemon common stock and/or options on Lululemon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

319.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Common Stock Class, and the Trust and the other members of the Options Class, suffered damages in connection with their purchases of Lululemon common stock and/or purchases of options on Lululemon common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

320.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

321.    The Individual Defendants acted as controlling persons of Lululemon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Lululemon, the Individual Defendants had the power and authority to cause Lululemon to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiffs as Class Representatives of the Common Stock Class, and the Trust as Class Representative of the Options Class, under Rule 23 of the Federal Rules of Civil Procedure, and appointing Co-Lead Counsel as Class Counsel for both Classes;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the Common Stock Class, and the Trust and the Options Class, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Common Stock Class, and the Trust and the Options Class, their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Lead Plaintiffs and the Common Stock Class, and the Trust and the Options Class, such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: March 10, 2025            ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 MICHAEL G. CAPECI


                                 _____
                                     /s/ Michael G. Capeci
                                 MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mcapeci@rgrdlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

POMERANTZ LLP
JEREMY A. LIEBERMAN
BRIAN CALANDRA
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212/661-1100
212/661-8665 (fax)
jalieberman@pomlaw.com
bcalandra@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: 212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff the John
Fogel Revocable Trust*

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiffs Macomb
County Employees' Retirement System, Macomb
County Retiree Health Care Fund, and Macomb
County Intermediate Retirees Medical Benefits
Trust*

- 71 -

**CERTIFICATE OF SERVICE**

I, Michael G. Capeci, hereby certify that on March 10, 2025, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ Michael G. Capeci*
MICHAEL G. CAPECI